Next case for today is 2020-50250 Caroline Ross v. Judson Independent School District. Mr. Watts, you may proceed with your argument. Good afternoon, Your Honors. I am daunted by the opportunity to address this panel this afternoon. And I can tell you that I never thought that I would be able to discuss the Mission Independent School District v. Garcia with its author. And it's good to see Judge Elrod again, Judge Englehart, and Judge Willett, of course. This is not a typical case. Caroline Ross was 19 years in Judson Independent School District in the secondary level. During that time, at the last eight years, she took a low-performing school, turned it around, was feted by First Lady Laura Bush, was conferred with and placed on conference by Senator Menendez, and was visited by people from all over the country. The events that led here occurred after the first and last black superintendent of Judson Independent School District had prematurely retired in April of 2015, after being essentially forced from office by some board members and his assistant superintendent, not his associate, but his assistant superintendent, Ella DiBera. This is not a reduction-in-force case. And this is a case, I'm sure, where the attempt to determine why I think that a race discrimination case has been laid out in prima facie form is an issue that brings us here today. I had intended to start this session by asking the court for leave to resubmit or rebrief, to make sure that Mrs. Otte and I could present to you all the facts. I have about 91 facts, discrete facts, from the record on appeal that I wanted to present to you. I hope that I will not go past the record on appeal, and if I do, I certainly will alert you to that fact. Excuse my voice this afternoon. Secondly, I'm not going to ask you to do that, because I think your time is far more valuable. And I think that there is a sufficient amount of information here for you to determine that this is a case where, frankly, the issues of true replacement or replacement might not even come to the fore. I'm reminded of a case that was handed down by the Chief Justice and the court on June the 18th of this past year, and that is the Department of Homeland Security versus the Board of Regents of California. In that case, Mr. Chief Justice Roberts reminded us that it's very important for governmental entities, when they have rules, to follow their rules. And if they don't follow their rules, to tell us why they don't follow their rules, or to do neither, is arbitrary. So I think that we're going to find here, and hopefully you will have seen here, that there's been a substantial amount of deviation from the rules and statutes of the Judson Independent School District in the state of Texas by the Judson Independent School District. I've tried to point out in one of the supplemental briefs, excuse me, supplemental record, where the policies of the district say that the burden of proof or the standard of proof at the board level will be preponderance of the evidence that counsel for the district. Mr. Russo spent a great deal of his time throughout the procedure, and at the end in his argument especially, telling the board that all they had to do was follow substantial evidence rule guidelines, find some evidence, some scintilla of evidence on one point, and then they could justify their action and go home. Mr. Watts, could you help us on the prima facie case element four of whether or not she was replaced by someone in her protected class or not? Sure, she was replaced four times. The first time was Nato James, black male. She selected Mr. James. It was alerted, as predicted probably by a former Chief Justice Jefferson in Garcia, that the school district was going to go to school on that. So they quickly took Nato James out of there because he was younger and a male. She was then replaced by another temporary, and that's Deborah Grady. Deborah Grady didn't want to go in because she had a position that was in central office in instruction and curriculum. She resisted going in, and the only way that they could get her to take the position through the end of the school year, telling her that was all that was necessary, would be if she would accept the fact that they were going to remove some negative information from her file, and let her return to her position as the Instructional Curriculum Director, and that afterwards she'd be happy again. Well, that's exactly what she called her union. The union said, that sounds like a good deal. Do it. She did it. All of that's in her affidavit. She went out of office during the summer and got promoted. The third replacement was Ms. Tracy Valray. Ms. Valray was about six years younger. She had no secondary experience, all elementary experience. She had a troublesome past at her own school where she was principal, and she was brought in because of her race. That's clearly, I think, the facts. We know that there is independent evidence of that because Ms. Renee Frenier, who was the director of CATE, and who was in office as our suite mate with Ella de Vera, and Vera, by the time that this happened at the end of the summer of 16, by that time she had been the person in charge of the principals at the Judson Independent School District for one school year. We know that in that deposition, as referred to by the court as a deposition, it was an affidavit verification. But in that, it was in detail that Ms. Vera was quite open about the fact that she wanted to have a Hispanic or white replacement. The fact of qualifications, she was not qualified. And although the district court referred to her as Dr. Valray, she had no doctorate degree at the time and was not in the doctoral program until after the event started. The fact is, my client, Ms. Ross, was in the program and she was Superintendent Montoya's, one of his two interns, superintendent interns, at the time that she was non-renewed. So I think that the qualifications issue, she was not qualified. And how do we know that? Because at the end of the three years, and the judge pointed out, or the magistrate judge pointed out that it took three years to figure it out, I think it took three years because we were in this process right here. At the end of the three years, she took a school that had been recognized by the state of Texas, no small feat, where it had transmogrified itself under the guidance of Ms. Ross from a low-performing school when she went there to a recognized school when she was removed. Ms. Valray took that school and turned it into an F-rated school by the state of Texas. Now, during the hearing on June the 7th, 2016, counsel for the district pointed out, and Mr. Salyer, the board president, who thought he was co-counsel, I think from time to time, especially if you look at the way that he himself made some objections to testimony in the record that you have before you, I think that may be at 1278, 1279. But Mr. Salyer and Mr. Russo agreed that Ms. Ross's academic excellence and performance had nothing to do with why they were removing her. So then we go after, at the end of the school year of 19, and this is out of the record, but this is public record. It's something that you could take judicial notice of if you were asked to on the record. I guess I'm asking you to. You can look at the records of the Texas Education Agency, the schools that certified educators are assigned to in the state of Texas, and I believe that this week it will still show you that Ms. Valray is out of education. That after she left, after she was pulled in 19 from the Metro school, she was reassigned, demoted to an assistant principalship at another elementary school, or at an elementary school, and then she resigned as the basis of that. So that leaves the last replacement. The last replacement, I think, is a true replacement. But I don't think you have to get there. And here's why I don't think you have to get there. Because the jurisdiction is a two-way street. In Texas, the legislature has pointed out in Texas Education Code 21.203A that the board, before it decides, before it makes a decision to non-renew a teacher, and by the way, classroom teachers and principals are teachers. But before it decides, it must consider, and we know under 311 of the Texas Government Code that must is a mandatory verb and that it constitutes a condition precedent. The condition precedent in this particular case says that the board must consider. Well, the magistrate judge says that the evidence shows that the board reviewed. That's not what the evidence shows. What the evidence shows is that in part of the transcript during the testimony of Ms. Ross, she was asked by Mr. Connelly if she got what her last evaluation was. So what does the statute say? And the statute, by the way, is also tracked by policy. It's tracked by DFB legal. It says that the board must consider the most recent material evaluation. The most recent material evaluation was June the 11th, 2015. Judge Elrod, here's the point that I want to make on this. If you look at what happened, the chronology and dissect it, this is probably not the right case, I think, for you to determine whether or not the rule of orderliness should be broken and the federal rule, the federal interpretation on replacements be pulled closer to or adapted to the Texas rule. I think here's the reason. Ms. Ross was placed in her position at Metzger Middle School, and middle school is important because the magistrate judge didn't pick that up. There was some misinformation about that in the mind of the writer of the opinion. Middle school, she was placed there, and she was there for about eight years by the first and last African American superintendent, someone who did a tremendous job in Judson, Willis Mackey, Dr. Willis Mackey. Willis Mackey was from Port Arthur, and he went from Port Arthur to Judson, and he did very, very well. He actually had a stop along the way where he was at Beaumont as an assistant superintendent. When he put her there, it was a low-performing school. By the way, everything that said negative about her, everything that was said negative about her is an accusation. I want you to keep in mind that everything was based upon what Lauren Hopkins said, but Lauren Hopkins gave sworn testimony when I finally was able to get sworn testimony from her during depositions and had her subpoenaed. She said that Ross never did anything dishonest, never lied, and cared about everybody in her life. I thought that was pretty dramatic. The superintendent that replaced Mackey, and I'm going to go back to Mackey in just a minute, but the superintendent that replaced Mackey in April of 2015, Dr. Carl Montoya, said that if it had been his decision, she would not have been non-renewed. Well, unfortunately, the law says it has to be his decision. It has to be his decision. He says that he was so afraid to give her a positive recommendation because she was a good principal, he was so afraid of his job as superintendent, and keeping in mind that the record shows he has two daughters that taught there as well. It was a family risk, I suspect, that he was so afraid that he didn't give Ross the recommendation she should have had. He also says in his record, in his testimony, one last point before I get back to where I was, Judge Elrod. He also says in his testimony that it was clearly linked, and I put this in the motion to dismiss when I dismissed the case against individual damages against Dr. Montoya. He said the reason was because he was honest. He came up and said in his testimony that the reason that Ms. Ross was non-renewed was linked to what had happened during the immediate preceding year to a white administrator who had been forced out by him. Mr. Watts, your time has expired, and you've saved time for rebuttal, sir. Okay, am I over? Yes, you have time for rebuttal, but you've gone. I'm sorry, I've been talking. I let you keep going, but your time is well expired. All right. But you have time for rebuttal. I'm sorry. Anyway, so, Ms. Payne. Good afternoon. May it please the court. I'm Katie Payne on behalf of the Judson Independent School District in San Antonio, Texas. Just to start with, Ms. Ross was employed under a Chapter 21 term contract under the Texas Education Code, and that's an important distinction to make because the first employment action that was taken against her pursuant to Texas law had to be taken by the Board of Trustees, and that's exactly what happened in this case. That's one of the reasons why the allegations against the assistant superintendent I don't believe are particularly probative in this instance, and that there's no evidence in the record, no competent summary judgment evidence indicating that any of the Board of Trustees had any type of racial, sexual, or age-based discriminatory animus against Ms. Ross. So, Ms. Ross was proposed for non-renewal by the Board of Trustees. She was issued a statutory notice letter that laid out the reason the policy violations that she was being charged with. That statutory notice in Chapter 21 of the Education Code does not require the Board to provide evidence. Yes, ma'am. The people that were the decision makers, though, didn't they get input from others? And so, there's the cat's paw issue that when you get the information that says that they didn't know she personally violated all these policies. They had to get that information from others who may have had discriminatory animus, and we have to consider that, don't we? Well, you would, Your Honor, if an appellant had pleaded the cat's paw theory of liability, which she did not. If she was going to do that, she needed to not only show that a colleague or supervisor exhibited prohibited animus, which I do believe she's briefed that piece. But the second piece is pretty important, and she needed to show that that same colleague or supervisor possessed leverage or exerted influence over the decision maker. In this case, the Board first acted to propose non-renewal. Then, after Ms. Ross requested a hearing, the Board held a full evidentiary hearing. Eleven witnesses were called. They were examined and cross-examined. Ms. Ross herself gave testimony. She was represented by the advocate of her choice. I don't say counsel because I believe he had been disbarred. It's obviously not her counsel that's appearing here today. She was able to submit evidence and cross-examine witnesses, and the Board voted after that hearing. So I do feel like there's a complete failure in the record to show that second piece of the cat's paw theory of liability, that this assistant superintendent somehow exerted control over six publicly elected Board of Trustee members. Along those lines, I do want to clear up some representations that counsel made as far as supplementing the record. You referenced several times in there to sort of indicate that Mr. Russo was in somehow some capacity at the hearing representing the Board. That is not true. In the record at 10.20 to 10.27, it's very clear that the Board was represented by Laura Fowler of the Fowler Law Firm. Mr. Russo was representing the administration. The portion of the transcript that was supplemented into the record and that Ms. Ross takes issue with is the closing argument of Mr. Russo as counsel for the administration. So it's not evidence. It's a closing argument by an attorney. It wasn't objected to, so if it were evidence, it would still be probative. But perhaps most importantly, if you look at the transcript of the record, the actual vote that was taken by the Board of Trustees specifically states, I move that the evidence shows that the superintendent's recommendation is supported by a preponderance of the evidence. And then five Board members voted in favor of that and one voted against. To go to the first issue on Ms. Ross's race and sex discrimination claim under Chapter 21 of the Texas Labor Code, the replacement issue. As has been discussed, there were one or possibly two temporary replacements who served in that capacity while Ms. Ross was on administrative leave, starting in February of 2016 and going through until she was non-renewed in June of 2016. Starting with the beginning of the 2016-2017 school year, her permanent replacement was Dr. Tracy Valery, who was also an African American woman. The district has never argued that that should prevent Ms. Ross from establishing her prima facie case as to age, because Dr. Valery, the permanent replacement, was younger. Dr. Valery served in that capacity for three full school years. Even the cases cited by plaintiffs in her brief that try to make a fact issue as to whether or not Dr. Valery was a permanent replacement, even those cases, if you look at them, especially the, I believe it's the St. Cloud case, the permanent replacement in that case was only in his position for a year. In this case, we have Dr. Valery in position for three full years. In fact, her tenure at this middle school campus lasted longer than the assistant superintendent, Ms. Barra's, tenure with the school district. Ms. Barra left the district's employment at the end of the year in 2018, or middle of the school year, but in November of 2018, and Dr. Valery remained in her position until the end of that school year. According to plaintiff's own allegations in her brief, Dr. Valery was moved from that position after the state test scores at that campus had lowered. There's no evidence put forth in the record that would indicate that Ms. Barra was able to still pull the string six months after she left the district for employment elsewhere. Specific to the issue of the cat's paw theory of liability, I do want to also add that I don't believe that that was in any way raised in front of the district court, nor was the direct evidence theory of liability in any way raised in front of the district court. We have to do McDonnell Douglas, because there's no direct evidence that she was either on her race or on her age, discriminated against by any of these statements that we want to replace with a different race person or that sort of thing. Your Honor, while I do believe that she has brought forth that argument in her brief on appeal, I don't believe that it's in her live pleading or in her response to the district's motion for summary judgment. Would you agree if there was a live claim that we wouldn't be doing the McDonnell Douglas analysis on that claim? I think you would, if it were a live claim, you would probably want to look at it both ways, unless you found definitively in favor of the direct evidence theory of liability, because I do believe plaintiff has also asserted the. Right, we would do it both ways, but on that part of it, we would just look at these direct statements and see if they rose to the level of direct discrimination, evidence of direct discrimination. Correct, and I do think. I don't know what tool it is that we would use. Yes, Your Honor, I would agree with that. I'm saying it's not preserved. I'm saying it's not preserved, and even if it were, I don't think there's any evidence in the record that any of the board members who took the adverse action, that there's any direct evidence of discrimination attributable to any of those board members. And I don't think that there's any evidence of the record that would support a finding on the Katzpah theory of liability. Could you help us just holistically on the pretext, you know, you could look at some of these things, you know, had children in the Bible study late to class, gave your secretary your password to enter something. Some of these things seem a little bit, someone could say that maybe they were building a record looking for ticky-tack violations. I'm not saying that's what happened here, but would you be able to address the record holistically for the idea that, you know, it's a whole bunch of little things, not something that is, you know, it's not related to some kind of scandal or something that we see in some other cases. Could you address that? Yes, Your Honor, and I think that the answer to that goes back to the distinction that Texas law makes when we're talking about a mid-contract termination for good cause, as opposed to a non-renewal of a contract at the end of the contract term. In Chapter 21 of the Education Code, it really makes clear that if you've got, like you said, sort of a scandal or maybe something horrific that happens during a contract, then the district needs to move for a mid-contract termination. It has a good cause standard. It has to be done in front of an independent hearing examiner that's appointed by the Texas Education Agency, which obviously is sort of a great expense to school districts, but it's important because there's due process rights at issue, right? As opposed to that, when we're talking about non-renewal, the Texas legislature has determined in Section 21.204 that there is no property right at issue when we're talking about non-renewing at the end of the contract term. For that reason, that process is supposed to be used more along the lines of issues that maybe, like you said, kind of add up to a totality of the situation where we don't want to renew this person's employment for the following year. In some instances, it's used where people fail to remediate performance deficiencies. I would say that comes into play in this case in regards to the fund activity issues, the accounting issues, the failure to properly account for and countersign checks. I would say that that's sort of a failure to remediate issue. On the other hand, I think there are some issues in this case that if it had to have been a mid-contract termination that could have lent themselves to that. One of those issues is the lack of truthfulness in the investigation. The Commissioner of Education has been very clear that lack of truthfulness is not something that a school district is expected reasonably to be able to remediate. I also think that as a practical matter, sometimes when you have someone like a campus principal who has quite a bit of autonomy and at the same time is expected quite a bit to exhibit the type of leadership that we want our students to emulate, when you start an investigation on someone like that and you're interviewing people like their assistant principals and their personal secretaries, information is going to bubble to the surface. Then the question becomes, well, what do we do with that information? It's maybe not what we set out to investigate. But now we have it, and we have the requirement to demonstrate that this person who has a Chapter 21 contract that's going to automatically renew unless we show that she has violated our policy in some specific way. Do we just throw those issues away? Especially in a situation like this, in which we found out during the process that one of the witnesses for the financial issues, she was an Atwell employee, she resigned, we can't force her to keep working for us, and she refused to appear at the hearing. Boards of trustees do not have subpoena power, and for that reason, I think that's why those other issues were included. If the issues come up in the investigation, if you have a witness available who's going to testify to it, and the standard that you bear is to demonstrate by a preponderance of the evidence that there was a policy violation, you're probably going to go ahead and put it out there. Especially when we're talking about a campus principal, which is a fairly high-profile position, and we want to make sure that when we are renewing folks for employment, that they meet the standards that we've set out in our policy. I don't think counsel, Mr. Watts, said that if these people enter principal level, would be treated like teachers for due process, but is that accurate? Yes, your honor, that is accurate. In Texas, teachers, educators, counselors, assistant principals, principals, folks of that nature who are required to hold certification from our state board of education, they have basically the same type of contractual rights. They have the due process rights that teachers have. In Louisiana, for example, I believe, the principals are treated differently, and they don't actually have the same due process rights, and they have contracts as opposed to a quasi-property interest. No, your honor, that would be different in Texas, correct? The principal and teachers have the same type of Chapter 21 contract. Maybe Mississippi, I'm confusing it with, but it's one of our states. Okay, thank you. Absolutely. And just to reiterate, the Texas state law is very clear that there is no property right except during the contract term, and that is equally applicable to teachers and principals. Along those lines, I think Ms. Rouse's due process complaint fails pretty clearly in the first instance, because she did not have a property right at issue in this case, because it was a non-renewal. On appeal, she has raised several complaints about the process she was given. I don't think that fixes the first fatal flaw as far as no property right, but just to address those, she had the right and utilized that right to appeal her non-renewal to the Texas Commissioner of Education. Texas Commissioner of Education has jurisdiction to perform a substantial evidence review of the reasons supporting the non-renewal. He also has jurisdiction to determine if the board acted in a manner that was arbitrary, capricious, or unlawful. And if Ms. Rouse had complaints about the process, that was the time to make them. She didn't do so. She may have raised arguments, but failed to fully brief them, failed to cite to the local record. And as a result, the Commissioner of Education held that she had failed to exhaust those arguments and failed to establish jurisdiction. As far as the specific complaints about the process that she was given, I know there's been a complaint about hearsay being produced at the hearing, that hearsay was not objected to. So under the Texas rules, it is considered probative evidence. However, it's also clear that when boards, in this case, hold non-renewal hearings themselves, as opposed to inviting an independent hearing examiner to hold the hearing in the first instance, that they are not required to apply the rules of evidence. They can choose to under their policy. This district, like lots of districts in Texas, chose not to. So the Commissioner, and it's been upheld by the Texas, the Austin Appeals Court here in Texas, that it's not a requirement that boards apply the Texas rule of evidence in a non-renewal hearing. I think the primary reasoning behind that is because there is no property right at issue. The other complaints that Ms. Ross has raised in regards to the process that was given her, I think has to do with the fact that it was an open hearing. And so I do just want to reiterate that prior to the hearing, she actually requested in writing via her counsel, or I'm sorry, her advocate, that it be an open hearing. She reiterated that on the record that she wanted to hear at the hearing, that she wanted it to be open to the public. I think that is pretty fatal to any type of liberty interest based due process claim that she might have. And as far as her sex, age, and race discrimination claims, I do want to just briefly touch on the issue of the complete lack of pretext that's been shown in this case. Especially any type of pretext that might be attributable to the Board of Trustees. I know that we've argued that the factual findings of the Commissioner of Education should have preclusive effect and that she should be collaterally stopped from attacking them. I think the district court judge sort of sidestepped that argument a little bit. And I'm not sure that he was wrong to do so, because I think in this case there is such a complete dearth of evidence as far as pretext that this may be not the case where that issue has to be affirmatively decided. Ms. Payne, quick question that's admittedly fairly pedantic, but when you moved for summary judgment, you also sought dismissal. You filed a plea to the jurisdiction as well with respect to the discrimination claims. And the district court, as we know, granted summary judgment in your favor on the discrimination claims. And my question is simply, was that technically correct disposition? Or instead, should the district court have dismissed those claims on jurisdictional grounds? Well, my understanding is that the court is supposed to make a determination that it does have jurisdiction first. So I think technically that probably would have been the correct order of proceedings. The district court did note, I think, in a footnote that based on the Texas Supreme Court's decision in the Alamo Heights v. Clark case, since all of the elements of a Tucker claim up to and including the pretext issue are jurisdictional in a situation like this in which evidence has been submitted and the correct plea standard is to basically treat it like a motion for summary judgment, I don't think that so he determined that it would also fail in the merits. I don't think that that's problematic. But as a technical point, I would agree that the court probably should have initially found that there was no jurisdiction as to that claim. We would ask that the court affirm the district court's summary judgment or possibly dismissal based on lack of jurisdiction as to the Tucker claim and then summary judgment as to the constitutional claims. Thank you. We have your argument, Mr. Watts, your turn, sir. I apologize. First of all, everything they fired her for on June or May the 19th of 2016. And that was the first vote they took to decide. And on June the 7th, 2016, she had passed the she had passed the mark on. She had been evaluated on in 2015. She had received satisfactory on on financial and physical issues. She had received excellent plus on all other issues. And that was the most meaningful, most recent and meaningful material evaluation that they did not consider. And consideration is an issue that what does that verb mean in Judson? It means that that that they will weigh and that they will they will analyze. I think just as Mr. Chief Justice Robert points out, too, it's a reasoned analysis that goes back to the old Johnson, the branch case out of the Fourth Circuit. But the point is that that they they everything they fired her for in 2016 or non-renewed or for happened in prior school years. It happened before she got her May 31st, 2015 contract renewal. It happened before she was evaluated on June the 7th of 2015, June the 11th, 2015. It was all past news. Now, what Barrow Barrow said that she's the one that made she admitted in her deposition. She was the one that made the decision to non-renew Ms. Ms. Ross. It was her it was her call. And she made that call based upon prior grievances. Keep in mind that Barrow tried to fire Barrow Ross under under Mackey, but he didn't he wouldn't do it. Instead, what he did was after her, he had her her attitude towards Ross examined. What he did was he demoted Barrow. He took her out of charge of the secondary principles, put her in charge of primary principles, elementary principles. And he put Ms. Nancy Robinson, his associate superintendent, in charge of the secondary staff. Also, in terms of race on the board, absolutely. Barrow says that the reason that she got so offended with Mackey was because he preferred blacks over browns, that he treated he treated Ross more favorably than he. This is in her deposition. He treated Ross more favorably than he treated Melinda Salinas. Hey, where did her name come from? She came. She dropped. She got so mad. And by the way, that's all public. You can get that still on the Internet. She got so mad that she retired out of the school district, ran for the school board and sat next to her father. Melinda and Arnold Salinas, father and daughter, daughter and father, were the ones that made the decisions, made the motions and the secondary motions, second motions to non-renew my lady. So race, I would say it's all over the place. And in terms of other rules, they violated the nicety of it is that they said that they that they weren't going to object to to the evidence. Texas rules of evidence didn't apply. You read through the record, not only 12, look at 1269, I believe it is as well as 1279. And you'll see that that did happen. But more importantly, I think that you're going to also see that that they they in fact changed the process from the nice, nice independent. They had they could call it. It could have been an independent hearing examiner. They could have had the rules of evidence. They could have had compulsory evidence, but they didn't. And the reason they didn't want to do that is because they were stacking the deck. When did, by the way, Barrow say that she was going to make that she learned that my client was going to be non renewed. She says in her testimony and her deposition and that she learned that the same day that that there was a principal's meeting on February the 23rd. That's a day before my client was suspended. That's the first day that that Ms. Hopkins was was interviewed. And why did Hopkins not show up. Why did Hopkins decide to retire, because Mr. Russo gave her a letter that at the with along with Hernandez. And by the way, Hernandez did just pop. She wasn't there for a long time. She was brought in between the Mackey and the Montoya administration. She had previously worked, we believe the evidence will show with Ms. Barrow's husband in the HR department at San Antonio Independent School District. But why did, why did suddenly Ms. Hopkins not show up because she was given a letter, she was scared to death. First of all, but she says she was made she was startled by Chief Raymond's telling her how serious it was. And by the way, she wasn't fired and she wasn't asked to resign. But she didn't show up because she was handed a prepared letter. And the letter said I resign and I will not testify. That's in effect, you've got it. So she didn't show up and they didn't have they changed the process at the at the motion of Melinda Salinas on May the 19th, 2016, so that there was no compulsory process, no way to make her come forward. I had to chase in 2019 I had to chase her all over the darn country in San Antonio, excuse the expression, to have her served by a deputy constable. Finally got her. She came down there and she testified. The whole point is they fired my lady for stuff that she had already passed, passed the muster on. Number two, there was Ms. Salinas was was courted. Montoya says that that that Mackey left because the board was turned against him. And because of a bear being against him. And, and all that changed when Mackey left in April of 2015, and they brought Montoya in Montoya in almost immediately. Montoya gave gave Ross a new contract. She was evaluated, and then starting in the fall. Now keep in mind to that all of this. How do you know race has anything to do with Mr. Watts, you need to wrap it up it's your time is expired. Last statement, last statement. Look at the evidence in the that we presented to you in the record, they had named in September of 2015, a high school the new high school was Mackey, and it's so offended that they got all the social network storm in the white community out there, and in those. And whatever, and and started to just to take it down. They wanted to do it, and they didn't, but they finally did D name Melis Mackey high school, and they just set it to D name on the same night that the hearing on June the 7th, 2016, and we've got the evidence before you in the television. Thank you very much. Thank you, sir. Please. Thank you. Thank you. This concludes the argument in this case, we appreciate you appearing both of you. virtually for this argument, and we that we could hear and see you and still proceed in these conditions, and we will take the case under advisement in this, this matter is concluded for today. Thank you.